UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| BAYOU LAWN & LANDSCAPE SERVICES, NATIONAL HISPANIC LANDSCAPE ALLIANCE, NATIONAL ASSOCIATION OF LANDSCAPE PROFESSIONAL, SMALL AND SEASONAL BUSINESS LEGAL CENTER. SUPERIOR FORESTRY SERVICES, LLC, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs | ) ) |
| | ) No. |
| v. | ) _____ |
| | ) |
| JEH C. JOHNSON, LEÓN RODRÍGUEZ, THOMAS PEREZ, PORTIA WU, | ) ) ) |
| Defendants. | |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

## I.      INTRODUCTION

1.      Plaintiffs Bayou Lawn and Landscape Services ("Bayou"), Small and Seasonal Business Legal Center ("SSBLC"), National Hispanic Landscape Alliance ("NHLA"), National Association of Landscape Professionals ("NALP"), and Superior Forestry Services, LLC ("Superior"), challenge two regulations issued jointly by the United States Department of Labor ("DOL") and the United States Department of Homeland Security ("DHS") on April 29, 2015, ("New Rules").[1]  The New Rules are substantively arbitrary and procedurally invalid.  In the name of countering a theoretical "adverse effect," the New Rules are causing palpable injury to the domestic workers that the agencies claim they are protecting, the small businesses that employ them, and the communities in which they live and work.  The New Rules violate the

---

[1]      *See* (*Temporary Non-Agricultural Employment of H-2B Aliens in the United States*, 80 Fed. Reg. 24,042 (Apr. 29, 2015) (Interim Final Rule; Request for Comments) ("2015 H-2B Program Rule")); (*Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program*, 80 Fed. Reg. 24,146 (Apr. 29, 2015) (Final Rule) ("2015 H-2B Final Wage Rule")).

Administrative Procedure Act and the Regulatory Flexibility Act. The Court should stop the irreparable injury that the New Rules cause with a temporary restraining order, schedule an expedited hearing for entry of a preliminary injunction, enter a preliminary injunction, and after proceedings on the merits, permanently enjoin them.

## II.    JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction over all civil suits arising under the Constitution and laws of the United States, and 28 U.S.C. § 2201 (authorizing declaratory relief), 5 U.S.C. § 601 et seq. (Regulatory Flexibility Act), and 5 U.S.C. § 701 et seq. (judicial review provisions of the Administrative Procedure Act). This Court has jurisdiction to issue a writ of mandamus under 28 U.S.C. § 1651.

3.    Venue is proper pursuant to 28 U.S.C. § 1391(e).

## III.    PARTIES

4.    Plaintiff Bayou is a family-owned small landscape, irrigation and lawn maintenance business located in Valparaiso, Florida within Okaloosa County. There are an insufficient number of U.S. employees willing to work in this occupational and geographic area and therefore, Bayou relies on temporary employees hired through the H-2B program to meet its outstanding contractual commitments. Bayou currently employs 21 such H-2B temporary workers. The changes the New Rules make to the program adversely and immediately affect Bayou by driving its costs up substantially, limiting its flexibility and imposing bureaucratic hurdles that undermine the timeliness of approvals. The "corresponding employee" and "three-fourths guarantee" provisions will immediately and adversely affect its ability to bid successfully on new jobs by increasing labor costs significantly; they also make it difficult for Bayou to

2

continue to fulfill its long-term contract obligations given its inability to pass-on these significantly higher costs to its customers. As a result, Bayou will lose customers and goodwill and may be forced to close its doors. Bayou is being imminently and irreparably injured. Bayou is a small business within the meaning of the Small Business Act. Bayou is interested in having an opportunity to participate in the rulemaking related to the New Rules "through submission of written data, views, or arguments with or without opportunity for oral presentation." *See* 5 U.S.C. § 553(c).

5.      Plaintiff NHLA is a trade association located in South Miami, Florida, that facilitates and promotes the advancement of Hispanics as landscape industry professionals and leaders and provides Hispanic landscaping professionals a voice in the national dialogue on environmentally-responsible landscape practices, and a means through which to advance the interests of their businesses, the livelihood of their employees, and the quality of life in the communities in which they live and work. A growing number of Hispanic-Americans are becoming partners, buying firms, or starting new companies. Today, more than a half-million Hispanic-American families depend on the landscape industry for their livelihood. NHLA members rely on foreign nonimmigrant employees under the H-2B program. The New Rules immediately and irreparably injure NHLA's members by dramatically increasing labor costs and decreasing the utility of the H-2B program. NHLA is interested in having an opportunity to participate in the rulemaking related to the New Rules "through submission of written data, views, or arguments with or without opportunity for oral presentation." *See* 5 U.S.C. § 553(c).

6.      Plaintiff NALP is a not-for-profit membership corporation headquartered in Herndon, Virginia with more than 3,000 members. NALP was formerly known as the Professional Landcare Network. NALP is a small organization within the meaning of the

Regulatory Flexibility Act and approximately 300 of its members use the H-2B program, most of which are small businesses as that term is defined in section three of the Small Business Act. NALP and its members are and will continue to be irreparably harmed by the New Rules because they make the H-2B program virtually unusable to the landscape community by dramatically driving up costs and reducing the program's ability to meet current employment needs in a timely manner. NALP is bringing this suit both on behalf of itself and its members--both large and small--that participate in the H-2B program and on behalf of those members that do not participate in the program but that do business with entities that rely on the H-2B program. When those entities are economically injured, NALP's members that do business with them will also be injured. NALP is interested in having an opportunity to participate in the rulemaking related to the New Rules "through submission of written data, views, or arguments with or without opportunity for oral presentation." *See* 5 U.S.C. § 553(c).

7.     Plaintiff Superior is a closely-held small reforestation business located in Tilly, Arkansas. Superior has been in business since 1987. Superior has contracts and performs tree-planting activities in Northern Florida including jobs in Santa Rosa, Walton, and Okaloosa Counties. There are an insufficient number of U.S. employees willing to work in this occupational area and on an itinerant basis, which is required by the very nature of the work, and therefore, Superior relies on temporary employees hired through the H-2B program to meet its outstanding contractual commitments. Superior currently employs around 300 such H-2B temporary workers. The changes the New Rules would make on the program would adversely and immediately affect Superior by raising its costs substantially, limiting its flexibility and imposing bureaucratic hurdles that would undermine the timeliness of approvals. The "three-fourths guarantee" and the final wage-rule provisions will immediately and adversely affect its

4

ability to bid successfully on new jobs by driving up its labor costs significantly; they would also make it difficult for Superior to continue to fulfill its long-term contract obligations given its inability to pass-on these significantly higher costs to its customers. As a result, Superior would lose customers and goodwill, or be forced to close its doors, leaving its domestic workforce, most of whom reside in a rural area with few economic opportunities, without employment. In either event, Superior will be imminently and irreparably injured. Superior is interested in having an opportunity to participate in the rulemaking related to the New Rules "through submission of written data, views, or arguments with or without opportunity for oral presentation." *See* 5 U.S.C. § 553(c).

8.      The SSBLC is a 501(c)(6) not-for-profit association dedicated to promoting the common business interests of employers who use, or want to use, the H-2B Visa program and the agents, attorneys and trade associations that represent them. In the two months since SSBLC was organized, its membership has grown. As of today, the SSBLC members represent approximately 800 employers who participate in the H-2B Visa program. Those employers were granted certification for approximately 22,500 workers. That figure represents approximately 24% of total H-2B positions certified annually.  Many of the SSBLC's members are and represent small entities.  The New Rules irreparably injure the small employers that SSBLC's members represent because they make the H-2B program unusable by driving up labor costs and dramatically reducing the H-2B program's ability to meet employers' labor shortages. By irreparably injuring the employers that they represent, the New Rules irreparably harm the SSBLC members themselves and the organization as a whole. The SSBLC is interested in having an opportunity to participate in the rulemaking related to the New Rules "through submission of

written data, views, or arguments with or without opportunity for oral presentation." *See* 5 U.S.C. § 553(c).

9.      Defendant Jeh C. Johnson ("Johnson") is Secretary of Homeland Security. The Secretary of Homeland Security is responsible for all functions of the DHS, including the United States Immigration and Citizenship Service, which adjudicates Petitions for classification under 8 U.S.C. § 1101(a)(15)(H)(ii)(B). Johnson issued the New Rules on behalf of DHS. Johnson is sued in his official capacity; he is an official resident of Washington, D.C. and the New Rules were issued out of Washington, D.C.

10.     Defendant León Rodriguez ("Rodriguez") is Director of the United States Citizenship and Immigration Service. USCIS is a sub-agency of the Department of Homeland Security. Rodriguez is responsible for the lawful operation of USCIS. He is sued in his official capacity and is an official resident of Washington, D.C.

11.     Defendant Thomas E. Perez ("Perez") is Secretary of Labor. The Secretary of Labor is responsible for all functions of the DOL, including the Office of Foreign Labor Certification within the Employment and Training Administration, which asserts jurisdiction over the administration of the H-2B program. Perez issued the New Rules on behalf of DOL. Perez is sued in his official capacity; he is an official resident of Washington, D.C.

12.     Defendant Portia Wu ("Wu") is Assistant Secretary, Employment and Training Administration. The Employment and Training Administration performs the factual investigation required under 20 C.F.R. § 655.0 that culminate in a labor certification. DHS uses ETA's certification in adjudicating H-2B petitions. Wu is sued in her official capacity and is an official resident of Washington, D.C.

**IV.     COMMON FACTUAL ALLEGATIONS**

13.     "The Immigration and Nationality Act of 1952 ("INA") established a comprehensive statutory framework for the regulation of immigration in this country. See Immigration and Nationality Act of 1952, 66 Stat. 163, as amended, 8 U.S.C. § 1101, et seq. In relevant part, the INA included provisions for permanent and temporary foreign workers and provided a means through which those workers could enter the United States for employment purposes as long as certain conditions were met." See Order Granting Plaintiff's Motion for Summary Judgment, *Bayou Lawn and Landscape Servs. v. Perez*, Case No. 3:12cv183/MCR/CJK, December 18, 2014, p. 1-2 ("*Bayou II Order*"), p. 1-2.

14.     "Prior to 1986, a single program existed for all temporary foreign workers. Congress decided, however, that the earlier program did not "fully meet the need for an efficient, workable and coherent program that protect[ed] the interests of agricultural employers and workers alike" and therefore amended the INA as part of the Immigration Reform and Control Act of 1986 to provide for two separate programs: the H-2A program for agricultural workers and the H-2B program for non-agricultural workers. H.R. Rep. No. 99-682, pt. 1, at 80; see also Immigration Reform and Control Act of 1986, Pub. Law No. 99-603, § 301(a), 100 Stat. 3359, 3411 (codified at 8 U.S.C. § 1101(a)(15)(H)(ii)(a))." *Bayou II Order*, p. 2.

15.     "Under the H-2B program, which is the program relevant to this case, an employer may hire an individual "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country . . . ." *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b)." *Bayou II Order*, p. 2 (footnote omitted).

16.     "Congress vested authority for implementation of the INA's provisions in the Attorney General, but at the same time, directed the Attorney General to consult with other appropriate governmental agencies when considering applications for admission of H-2B workers. See 8 U.S.C. §§ 1184(a)(1) and (c)(1). Under the Homeland Security Act of 2002, Congress transferred enforcement of the immigration laws from the Attorney General to the Secretary of the Department of Homeland Security. See Homeland Security Act of 2002, Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (2002)." *Bayou II Order*, p. 2.

17.     In most instances, "DHS requires an employer seeking to petition for an H-2B visa to first apply for and receive a temporary labor certification from the Secretary of Labor. 8 C.F.R. §§ 214.2(h)(6)(iii)(A), (C). The certification constitutes 'advice . . . on whether or not United States workers capable of performing the temporary services or labor are available and whether or not the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers.' 8 C.F.R. § 214.2(h)(6)(iii)(A)." *Bayou II Order*, p. 3.  When the Secretary of Labor cannot make a certification decision, DHS regulations allowed employers to apply directly to DHS for issuance of an H-2B petition.

18.     DOL first issued formal regulations establishing procedures for certifying employers' requests to hire H-2 non-agricultural workers in 1968. *See* 33 Fed. Reg. 7,571 (May 22, 1968) ("1968 Procedural Rule"). Exhibit "A." *Cf. Bayou II Order*, p. 3. The 1968 Procedural Rule established "procedures" for the handling of H-2 certification requests. Nothing in the 1968 Procedural Rule purported to establish binding legal obligations on employers. DOL later supplemented the 1968 Procedural Rule with informal, non-binding guidance letters. *Cf. Bayou II Order*, p. 3.

19.     "It was not until 2008 that DOL published another formal regulation governing the labor certification process. See Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than Agriculture (H–2B Workers), 73 Fed. Reg. 78,020 (Dec. 19, 2008) (codified at 20 C.F.R. §§ 655–56) ["2008 Rule")]. On February 21, 2012, DOL issued the regulation known as the … "2012 [Program] Rule" … and, in doing so, significantly changed the manner in which the H-2B program would be administered. *See Temporary Non-Agricultural Employment of H-2B Aliens in the United States*, 77 Fed. Reg. 10,038 (Feb. 21, 2012)." *Bayou II Order*, p. 3.

20.     The 2008 Rule adopted new procedures for H-2B program administration in part because DOL centralized processing of certifications in its Chicago National Processing Center. The 2008 Rule, for the first time, purported to impose substantive obligations on H-2B employers.

21.     DHS issued its own H-2B regulation on the same day as DOL. *Changes to Requirements Affecting H-2B Nonimmigrants and Their Employers, Part VII, Final Rule*, 73 Fed. Reg. 78104 (Dec. 19, 2008) ("2008 DHS Rule"). The 2008 DHS Rule explained that a "market test" was the "principal means" that Congress chose to avoid "adverse effect." See 2008 DHS Rule, 73 Fed. Reg. at 120. DHS, however, explained that it lacked the administrative expertise to make the "labor market determinations" required by Congress. *Id.*  DHS therefore decided that it would treat DOL's labor certification determination, which included a market test, as dispositive in most instances. See 2008 DHS Final Rule, 73 Fed. Reg. at 78,110 (explaining that DHS "does not have the expertise needed to make any labor market determinations, independent of those already made by DOL.")  DHS intended only that DOL conduct "labor market determinations," not set minimum terms and conditions of employment during the certification process.

22.     In the 2008 Rule, DOL purportedly imposed an obligation on H-2B employers to pay the "prevailing wage" that other employers paid similarly-employed workers. The 2008 Rule contained a methodology for setting this wage. See 20 C.F.R. § 655.10 (2009). On January 19, 2011, DOL promulgated a new methodology for setting this wage. *Wage Methodology for the Temporary Non-agricultural Employment H-2B Program, Part VI*, Final Rule, Request for Comment, 76 Fed. Reg. 3,452 (Jan. 19, 2011) ("2011 Wage Rule"). Recognizing that "sound program administration" and "basic fairness" required it to give H-2B employers time to adjust to the new wage rule, DOL provided for a transition period of one year. *Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program; Amendment of Effective Date*, Final Rule, 76 Fed. Reg. 45667, 45,670 (Aug. 1, 2011).

23.     DOL acknowledged that the 2011 Wage Rule would cause job losses.  DOL explained that these job losses were "regrettable" but were a necessary result of setting H-2B wages at a level high enough to attract U.S. workers into H-2B jobs.  See *Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program; Amendment of Effective Date*, 76 Fed. Reg. 45667-68 (Aug. 1, 2011) ("We do not dispute that the implementation of the Wage Rule, whether on the amended or original timeframe, regrettably may result in the layoffs of H-2B workers and possibly U.S. workers in positions that support those that are currently filled by H-2B workers.") DOL, faced with a choice between protecting the jobs of currently-employed U.S. workers and protecting workers who might be interested in a more attractive H-2B benefit package, chose protecting the hypothetical workers.

24.     The 2012 Program Rule confirmed that DOL was firmly committed to imposing an economically-unreasonable benefit package on H-2B employers, even at the expense of domestic workers' jobs. In its Notice of Proposed Rulemaking, DOL predicted that the new rule

would reduce "the quantity of labor demanded," *i.e.*, reduce the number of job opportunities that employers offered by increasing the cost of employing H-2B workers. 76 Fed. Reg. at 15,162.

25.     By reducing the number of H-2B job opportunities by making it too expensive to hire them, DOL knew that the 2012 Program Rule would directly and substantially harm the American economy. DOL knew that the first effect will be to force small and seasonal businesses to "limit services, lay off permanent U.S. workers or even worse close their doors." 152 Cong Rec. S 2699, 2710 (daily ed. April 3, 2006) (statement of Sen. Mikulski); 151 Cong Rec. S 3616, 3638 (daily ed. April 14, 2005) (statement of Sen. Jeffords). From this statement and many others, DOL knew that the 2012 Program Rule would cost U.S. workers their jobs and small business owners their businesses.[2]

26.     In April 2012, a group of small businesses and associations of small businesses filed a lawsuit seeking to invalidate the 2012 Program Rule. *See Bayou II Order*, p. 3-4. The plaintiffs in that lawsuit consisted "of small family-owned businesses with low profit margins, high costs, and long-term contracts with their customers and associations representing such businesses." *Id.* at 4 n. 5.

27.     This Court found "that Plaintiffs had demonstrated a substantial likelihood of success on the merits of their claim that DOL lacked rulemaking authority in connection with the H-2B program and preliminarily enjoined DOL from enforcing the 2012 Rule. DOL appealed the

---

[2]     Numerous Senators expressed similar views on the purposes of the H-2B program: ("[I]t protects American jobs by keeping small and seasonal business open for business. It guarantees the labor supply that small businesses need during peak seasons is available, when they can't find Americans to take their jobs."); 151 Cong Rec. S 3513, 3539 (daily ed. April 13, 2005) (statement of Sen. Collins); ("Without these visas, employers are simply going to be unable to hire a sufficient number of workers to keep their businesses running during the peak season. Many of these businesses fear this year they will have to decrease their hours of operation during what is their busiest and most profitable time of year. This would translate into lost jobs for American workers, lost income for American businesses, and lost tax revenues for our States.") *Id.* Not only does an employer's participation in the H-2B program maintain American jobs, it creates more American jobs. 151 Cong Rec. S 3513, 3535 (daily ed. April 13, 2005) (statement of Sen. Warner) ("Over 75 percent of net new jobs in this country come from small businesses. . . . In many parts of the country, for every temporary H-2B worker that is hired, two more full-time domestic workers are sustained.").

Court's order to the Eleventh Circuit, which in turn affirmed. *See Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080 (11th Cir. 2013)." *See Bayou II Order*, p. 4.

28.     Meanwhile, Congress provided an unmistakable indication that DOL's willingness to trade the jobs of U.S. workers for more attractive terms and conditions of employment for hypothetical U.S. workers was contrary to Congress' intent. "On November 18, 2011, Congress enacted the Consolidated and Further Continuing Appropriations Act, 2012, Public Law 112-55, 125 Stat. 552 (November 2011 Appropriations Act), a spending bill that contained DOL's appropriations. That Act provided that "[n]one of the funds made available by this or any other Act for fiscal year 2012 may be used to implement, administer, or enforce, prior to January 1, 2012, the [2011 Wage Rule]." Public Law 112-55, div. B, tit. V, § 546 (Nov. 18, 2011). The conference report accompanying the November 2011 Appropriations Act stated that the purpose of the postponement was to "allow Congress to address" the 2011 Wage Rule. H.R. Rep. No. 112-284 (2011) (Conf. Rep.)." This prohibition would remain in place for the next two and a half years. *Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program, Part 2*, Interim Final Rule, Request for Comments, 78 Fed. Reg. 24,047, 24,052 (Apr. 24, 2013) ("2013 IFR").

29.     DOL pressed ahead on its policy of setting attractive terms and conditions for H-2B employment even at the cost of even more U.S. jobs to a new extreme in the 2013 IFR. Having learned that DOL lacked legislative rulemaking authority and having learned that small businesses would be willing to challenge them in federal court, DOL and DHS adopted a new strategy.

30.     DOL used litigation in the Eastern District of Pennsylvania to advance its new strategy. After having repeatedly warned that *vacatur* of the 2008 Rule would create a crisis,

DOL expressed its desire to be rid of the 2008 Rule as quickly as possible. The Court did not agree.  Instead, it ordered DOL to strike four words from the 2008 Rule's wage methodology. The Court allowed DOL to keep using the stricken four words for thirty days. *Comité de Apoyo a los Trabajadores Agricolas* (*CATA*) *v. Solis*, No. 2:09-cv-0240-LDD, United States District Court for the Eastern District of Pennsylvania.

31.     DOL informed the public that the court had stricken the entire 2008 H-2B Wage Rule methodology as it related to the use of Occupational Employment Statistics derived wages, the most common wage source. DOL has now admitted that the only change ordered was to delete four words from one subsection of one regulation (20 C.F.R. § 655.10(b)(2)). *See* 2015 Program Rule, 80 Fed. Reg. at 24,046 ("However, the 2013 IFR did only one thing: it made a single change to § 655.10(b)(2) to eliminate the use of skill levels in setting wages based on the OES. The 2013 IFR left untouched all the other provisions in the 2008 wage methodology, and those provisions remained in full force and effect in the 2008 rule following the publication of the 2013 IFR.")  Claiming that they could not process labor certifications with wage determinations based on a particular data base, DOL and DHS effectively shut the H-2B Program down for almost 30 days. Then, to solve the 'crisis', DOL and DHS issued an "interim final rule" that significantly raised H-2B wages. *Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program, Part 2*, Interim Final Rule, Request For Comments, 78 Fed. Reg. 24047 (Apr. 24, 2013).

32.     DOL then tried to make the IFR's wage increase retroactive by issuing new wage determinations. This was too much even for DOL's own administrative law judges, who unanimously vacated those determinations on December 3, 2013. *See In The Matter of Island Holdings*, No. 2013-PWD-0002 (BALCA Dec. 3, 2013) (*en banc*) Exhibit "B."

33.     Thus, as of December 2014, the 2008 Rule which DOL desired to rid itself of was in place and the six-year statute of limitations for a facial challenge to the 2008 Rule was rapidly approaching. So, upon information and belief, a decision was made to reprise the 2013 IFR strategy.

34.     Florida Rural Legal Services filed the necessary lawsuit on December 19, 2014. DOL then agreed to expedite the proceedings; refused to litigate available defenses; did not bother to investigate standing or assert a venue defense against a plaintiff from South Florida; and defended the 2008 Rule based on the one argument that DOL, Florida Rural Legal Services, and all observers knew would lose.

35.     The expected ruling came on March 4, 2015. DOL and DHS immediately shut down the H-2B program, even parts that had nothing to do with the issues in the case. For example, DOL prevented prospective H-2B employers from advertising their jobs with State Workforce Agencies to potentially interested U.S. workers.

36.     DOL and DHS represented that the Court's ruling prevented them from operating the program because there were no procedural mechanisms for providing advice to DHS, but that was not true. *See Perez v. Perez*, No. 14-682-MCR**,** Hearing Transcript, p. 73, ll. 13-17 (statement of G. Forney on behalf of DOL and Plaintiff) (Apr. 22, 2015) ("I think the Plaintiffs and the Defendants understand your order and we understand it has to do with the 2008 rule, has nothing to do with guidance documents. That is not – never been an issue in this case until the [putative] intervenors came in and started raising it as a separate issue.")

37.     DOL and DHS knew that their actions caused significant economic harm.  In mid-March 2015, the Secretary of Labor announced that DOL and DHS planned to remedy this harm

a month-and-a-half later by decreeing new legislative rules on an emergency basis for the H-2B program. No public comment would be allowed.

38.     DOL and DHS submitted the new legislative rules to the White House on or about April 13, 2015. They did not make the planned rules available to the public.

39.     On or about April 22, 2015, DOL and DHS submitted the final rules to the Office of the Federal Register.  The New Rules were officially published on April 29, 2015,

40.     DOL and DHS made the New Rules immediately effective.   Public comment would be allowed only after DOL and DHS had started enforcing them.

41.     On June 1, 2015, Plaintiffs filed this lawsuit.

## V.    CAUSES OF ACTION

**Count I – Defendants' Failure to Provide Prior Notice and Comment Violated The Administrative Procedure Act**

42.    Plaintiffs incorporate by reference the allegations of Paragraphs 1 to 41.

43.    Except in circumstances not present here, the Administrative Procedure Act requires federal agencies to give the public prior notice of proposed legislative rules and give the public an opportunity to comment on them before they take effect.

44.    All Plaintiffs are interested in having an opportunity to participate in the rulemaking related to the New Rules "through submission of written data, views, or arguments with or without opportunity for oral presentation." *See* 5 U.S.C. § 553(c).

45.    Defendants did not give interested persons, including Plaintiffs, prior notice of the New Rules before they took effect. Nor did Defendants give interested persons an opportunity to participate in the rulemaking "through submission of written data, views, or arguments with or without opportunity for oral presentation." *See* 5 U.S.C. § 553(c).

46.    By failing to provide the public prior notice of the proposed rule and providing interested persons an opportunity to participate in the rulemaking, Defendants avoided having to defend the New Rules politically until Defendants could position the New Rules as a *fait accompli*.  Defendants' failure to provide notice of the New Rules violated the Administrative Procedure Act.

47.    The Defendants also failed to provide the public an opportunity to comment on the New Rules before they took effect.  Defendants' failure to give interested persons an opportunity to participate in the rulemaking "through submission of written data, views, or arguments with or without opportunity for oral presentation," *see* 5 U.S.C. § 553(c), violated the Administrative Procedure Act.

16

48.     Defendants did not have "good cause" for depriving the public of prior notice, and an opportunity to comment on, the New Rules before they took effect. It was not impracticable, unnecessary, or contrary to the public interest to allow interested persons to participate in the rulemaking "through submission of written data, views, or arguments with or without opportunity for oral presentation." *See* 5 U.S.C. § 553(c).  Alternatives include:

(a)     If DHS wants to, it can adjudicate H-2B petitions using its safety valve regulation.  *See* 8 C.F.R. § 214.2(h)(9)(d)(6).  This regulation permitted DHS to adjudicate a petition based on countervailing evidence if DOL could not provide a certification. DHS has repeatedly said that it does not want this authority and the 2015 Program Rule repealed it. But DHS cannot say that it was unavoidably prevented from operating the program by the absence of this rule now since it was available before the 2015 Program Rule was issued.

(b)     If DOL wants to, it can process H-2B labor certifications using the procedures adopted in the 2008 H-2B Rule. *See Perez v. Perez*, No. 14-cv-682 (MCR/EMT), Motion Hearing Transcript, p. 73, ll. 13-15 (Mr. Forney) ("I think the Plaintiffs and the Defendants understand your order and we understand it has to do with the 2008 rule, has nothing to do with guidance documents.") If DOL and DHS want to, they could use the procedures for processing H-2B certifications and petitions contained in the 2015 Program Rule. DOL need not rely on antiquated procedures since it has a set of modern procedures at its disposal.

(c)     If DOL and DHS want to, they can formulate new procedures for processing H-2B certifications and petitions. *See* 5 U.S.C. § 553(b)(A) (exempting procedural rules from notice and comment).

49.     Defendants did not have "good cause" for making the New Rules immediately effective.

50.     Defendants' failure to provide notice and allow comment was prejudicial because it prevented important policy issues from being raised in a timely manner and prevented the public from providing data that would enhance the quality of any rule that may have followed.

By proceeding without notice and comment rulemaking, Defendants deprived themselves, among others, of:

- Data with which to estimate the costs and benefits of DHS' proposed approach. DHS' economic analysis repeatedly relies on assumptions and speculation about both the costs and benefits of the New Rules. Notice and comment rulemaking would have provided DHS with the data that it needed or identified alternative approaches for making reasonable estimates in the absence of specific data. Having this data may have altered DHS' decision making.

- Analysis about the effects of eliminating the countervailing evidence regulation in various industries. The recent experience of shut-downs emphasizes the necessity of employers having a safety valve if DOL's unlawful actions impair its ability and/or willingness to provide timely labor certifications. By failing to provide an opportunity to comment, DHS prevented the employer community from providing information about the full scope of the harm that eliminating that regulation will have.

- Information about how changes in Mexico affect the agencies' foreign recruitment provisions. The growth in strength and scope of criminal syndicates in Mexico over the last few years is well-known. Given this reality, the agent community would have provided DHS with information about the very real dangers some of its foreign recruitment provisions pose to the physical safety of the foreign facilitators and U.S.-based (e.g., Texas) agents.

- Discussion about the very real shortcomings of, and bizarre results resulting from, the selected wage-setting mechanism. DHS' analysis in this area is heavy on economic theory, but would certainly be better informed and validated by surveying the practical results. DHS cannot rationally evaluate the alternatives without this information and an opportunity to comment would have provided it.

51.    Defendants also deprived Plaintiffs and other interested persons of the procedural protections of the Administrative Procedure Act. As a result, Defendants' failure to provide prior notice of proposed New Rules and to accept comment before making them effective violated the Administrative Procedure Act.

### Count II – The New Rules Are Arbitrary and Capricious

52.    Plaintiffs incorporate the allegations of Paragraphs 1 to 41 as if restated herein.

53.     The New Rules are arbitrary and capricious for the reasons stated above and also because:

  a.  DOL lacked legislative rulemaking authority with respect to the H-2B program;

  b.  DHS lacked legislative rulemaking authority to require DOL to certify that a particular H-2B job would not have adverse effect;

  c.  DHS lacked legislative rulemaking authority to give DOL a veto over its adjudication of H-2B petitions;

  d.  DHS lacked legislative rulemaking authority to promulgate rules for the Fair Labor Standard Act;

  e.  DHS' and DOL's definition of temporary is inconsistent with the definition of that term under the Immigration and Nationality Act;

  f.  DOL failed to provide data or other evidence to support its programmatic changes;

  g.  DOL did not provide any evidence that any of the new provisions would avoid injuring U.S. employees;

  h.  DOL and DHS improperly increased the prevailing wage ostensibly to attract additional U.S. employees, without statutory authority;

  i.  DOL and DHS erected an irrebutable presumption of adverse effect if an employer offers less than DHS' and DOL's prospective standards and therefore deprive employers of due process and a reasoned decision on their individual certifications; and

  j.  Such other arbitrary and capricious acts as the record reveals.

### Count III
### Defendants' Failure to Properly Perform a Regulatory Flexibility Analysis
### (5 U.S.C. § 601 *et seq.*)

54.     Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 – 41, above.

55.     Defendants did not conduct a separate RFA analysis for the New Rules because they found "good cause" to forego that analysis. For the reasons alleged above, Defendants did

not have the requisite good cause. Defendants' failure to perform a regulatory flexibility analysis violated the RFA as a matter of law.

56.     In addition, the New Rules will have a significant economic impact on a substantial number of small entities, including Plaintiff small businesses and the small business members of Plaintiff associations. Plaintiff small businesses will be compelled to spend significantly more to employ their H-2B employees and also for their regular U.S. employees or curtail operations either in part or in whole. Plaintiff small businesses cannot pass on these costs to their customers owing to the highly competitive nature of their businesses. In the short run, Plaintiff small businesses would either lay off a portion of their United States workforces or their entire workforces.  Ultimately, the significantly higher costs mandated by the New Rules would undermine Plaintiff small businesses' ability to compete, thereby imperiling the viability of those Plaintiffs that were able to survive over the short run. Defendants took none of this into account when conducting their RFA.

57.     The Small Business Administration has directed, and the courts have consistently held, that when measuring the impact of a rule on small entities, one uses in the denominator the number of small entities that would be practically affected by the rule. Here, that would be the number of small entities that participate in the H-2B program. DHS and DOL agree that virtually all of those entities would be adversely affected by the New Rules. Nevertheless, they concluded that the New Rules would not have a substantial adverse impact on a significant number of small entities because it compared the number of small entities adversely affected (about 6,890) with the total number of small entities (about 1 million), rather than with the number that could be affected by the New Rules (about 6,890). Using DHS' and DOL's methodology, the New Rules would adversely affect slightly more than one percent of the small entities in the U.S. Using the

correct methodology and the one confirmed by two courts, the New Rules would adversely affect 100 percent of the relevant small entities (i.e., 6,890 out of 6,890).

58.     As result, the Defendants' RFA analysis is incorrect as a matter of law and violates the RFA.

## Count IV – Mandamus

59.     Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1-41 herein.

60.     Defendant DOL has a clear legal duty to provide advice to DHS with respect to the adjudication of an employer's H-2B petition. If this Court enjoins, even preliminarily, the New Rules, there is a substantial likelihood that DOL will refuse to provide advice to Defendant DHS as DOL's clear legal duty requires.

61.     Defendant DHS has a clear legal duty to adjudicate H-2B petitions whether or not Defendant DOL provides its advice. Defendant DHS has a clear legal duty to reject advice from DOL based on statutorily unauthorized criteria or that is otherwise factually or legally incorrect. Defendant DHS has a clear legal duty to adjudicate H-2B petitions favorably if the petitioning employer establishes that the criterion established by 8 U.S.C. § 1101(a)(15)(H)(ii)(b) has been met by evidence that would convince a reasonable person of such fact. If this Court enjoins, even preliminarily, the New Rules, there is a substantial likelihood that DOL will refuse to provide advice to Defendant DHS as DOL's clear legal duty requires.

62.     Issuance of a writ of mandamus to Defendant DOL and Defendant DHS is therefore justified if they unreasonably delay execution of their clear legal duties with respect to the H-2B program.

## VI.    CONCLUSION

63.    In 1952, Congress deliberated about the best way to protect American workers when their employers faced labor shortages. One option was to allow American businesses to hire foreign workers temporarily, but impose high costs and administrative burdens through mandatory labor standards. The other option was to protect American workers' jobs by helping businesses hire foreign nationals if they could show that there was a shortage of domestic labor for the jobs. Congress chose the latter option in 1952 and reaffirmed its commitment to this approach in 1986.

64.    Congress' approach proved wise. The H-2B program worked well for almost six decades. It generated little to no controversy and created two new U.S. jobs for every H-2B worker hired. But Defendants preferred the approach Congress had twice rejected. Therefore, at the beginning of the Great Recession, DOL and DHS decided to try it. Defendants knew full well that protecting U.S. jobs this way would cost some U.S. workers their livelihoods and, to their credit, found this consequence of their policy to be "regrettable," but a small price to pay. Experience proved that Congress was right and Defendants' policy proved to be a failure. Rather than admitting their mistake, Defendants concluded that employing H-2B workers was not expensive enough and piled on new and more expensive regulations. The predictable result of this approach was hardship for workers and businesses alike, confusion, chaos, and litigation.

65.    The time has come to return to the H-2B program that Congress envisioned. Congress gave Defendant DHS legislative rulemaking authority. DHS, however, must use that authority consistently with the APA and cannot adopt an approach contrary to Congress' intent. If DHS chooses to issue a legislative rule, it must explain how its policy choices are consistent

with Congress'. It must also give the public a chance to comment on the proposed rule at a time when comments might make a difference.

WHEREFORE, Plaintiffs pray that the Court:

66.     Enter a temporary restraining order and preliminary injunction, pending a decision on the merits, enjoining the Defendants from implementing the New Rules titled *Temporary Non-Agricultural Employment of H-2B Aliens in the United States*, 80 Fed. Reg. 24,042 (Apr. 29, 2015) (Interim Final Rule; Request for Comments); *Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program*, 80 Fed. Reg. 24,146 (Apr. 29, 2015) (Final Rule).

67.     Enter a declaratory judgment as to Count I that the New Rules are invalid and enter a permanent injunction to prohibit Defendants from implementing the New Rules titled *Temporary Non-Agricultural Employment of H-2B Aliens in the United States*, 80 Fed. Reg. 24,042 (Apr. 29, 2015) (Interim Final Rule; Request for Comments); *Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program*, 80 Fed. Reg. 24,146 (Apr. 29, 2015) (Final Rule).

68.     Enter a declaratory judgment as to Count III, that DOL failed to undertake the required Regulatory Flexibility Act analysis and a permanent injunction to prohibit Defendants from implementing the New Rules otherwise giving effect to them until such time as the head of the agency with proper rulemaking authority discharges his or her responsibilities under the Regulatory Flexibility Act to the satisfaction of the Court, and retain jurisdiction of this case to ensure compliance with the Regulatory Flexibility Act.

69.     Issue a writ of mandamus as needed to ensure that Defendants execute their clear legal duties to timely adjudicate individual H-2B visa petitions in the future without shutting down the H-2B program.

70.     Award Plaintiffs their costs and expenses, including reasonable attorney's fees whether under the Equal Access to Justice Act or otherwise, and expert witness fees; and

71.     Award such further and additional relief as is just and proper.

Dated this 1st day of June, 2015.

| | |
|---|---|
| /s/Robert C. Palmer, III | /s/ Wendel V. Hall |
| Robert C. Palmer, III | Wendel V. Hall |
| Florida Bar No. 316776 | DC 439344 |
| Wade, Palmer & Shoemaker, P.A. | Hall Law Office, PLLC |
| 14 N. Palafox Street | 1200 G Street, N.W., Suite 800 |
| Pensacola, Florida 32502 | Washington, D.C. 20004 |
| Phone: 850-429-0755 | Phone: 202-661-2173 |
| Fax: 850-429-0871 | Fax: 202-434-8707 |
| Bpalmer@wpslawyers.com | halllawfirmdc@gmail.com |